UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JOHN R. JETT,                          )
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )          Case No. 2:08CV62MLM
                                       )
MICHAEL J. ASTRUE,                     )
                                       )
          Defendant.                   )

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue ("Defendant") denying the application for Disability Insurance Benefits under Title

II of the Social Security Act, 42 U.S.C. §§ 401 et seq., filed by Plaintiff John R. Jett ("Plaintiff").

Plaintiff has filed a Brief in Support of the Complaint. Doc. 13. Defendant has filed a Brief in Support

of the Answer. Doc. 15. The parties have consented to the jurisdiction of the undersigned United

States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Doc. 10.

## I.
## PROCEDURAL HISTORY

On November 2, 2006, Plaintiff submitted an application for benefits, alleging a disability

onset date of September 1, 2005. Tr. 11, 113-15. Plaintiff's application was denied on April 5, 2007.

Tr. 78-86. On June 27, 2007, Plaintiff filed a timely request for hearing. Tr. 87. A hearing was held

on June 17, 2008, before an administrative law judge ("ALJ").[1]

---

[1]     The hearing was conducted by way of video conferencing. The Administrative
Law Judge ("ALJ") and the Vocational Expert were in St. Louis, Missouri, and Plaintiff, his
representative, and the Plaintiff's witness were Hannibal, Missouri.

The ALJ issued a decision on July 8, 2008, finding Plaintiff not disabled within the meaning of the Act. Tr. 11-17. On August 4, 2008, Plaintiff filed a request for review with the Appeals Council. Tr. 6, 4-7. On September 16, 2008, the Appeals Council denied Plaintiff's request for review. Tr. 1-3. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## MEDICAL RECORDS

Records from Quincy Medical Group, dated October 18, 2004, reflect that Plaintiff was diagnosed with bronchitis. Tr. 300.

Records from Michael L. Moulton, M.D., dated December 15, 2004, reflect that Plaintiff presented to Blessing Hospital in Quincy, Illinois. Record of this date state:

> On the day of admission, [Plaintiff] noted onset of mid sternal chest pressure non-radiating, and some shoulder aching. He did not take nitrates. He had nausea and diaphoresis. He presented to Blessing Hospital Emergency Department. By the time he arrived, his pain had completely resolved. He was admitted to the hospital for further evaluation and management as described.

Tr. 181.

A December 15, 2004 x-ray report, completed by radiologist Dr. Jose Rodriguez, states that there were findings of "[h]yperinflation of both lungs. No evidence of active infiltrate, cardiomegaly, or congestive failure. No change from 06/2004." Tr. 183. The x-ray report further stated that there was "no evidence of an acute process in the chest." Tr. 183. Records of this date further state, in regard to "Impression and Plan," as follows:

> 1. Chest discomfort. Patient with what appears to be a new onset of angina. At this point in time, would proceed with institution of oral nitrates. The patient states that he adamantly will not stay in the hospital and is going to be leaving regardless of being discharged or signing out AMA. I did discuss with the patient that he needs a cardiac catheterization. At this point, we will proceed with an evaluation that should include a cardiac cath. We will refer back to Dr. Heilman; 2. Patent foramen ovale closure.

Follow-up echo is already scheduled; 3. Diabetes mellitus. Patient continues to manage his own blood sugar, although on arrival, he was significantly hyperglycemic. He refuses any attempts to adjust his current regimen. Other problems not as active at the present time.

Tr. 182.

An August 17, 2005 report prepared by Steven Brandes, M.D., of the Mallinckrodt Institute of Radiology at Barnes-Jewish Hospital, states that Plaintiff had a penile prosthesis placed in 2000; that subsequently, Plaintiff needed the implant removed and had penile reconstruction and skin grafting; and that Plaintiff had been referred for evaluation by Dr. Childress for "what sounds like verrucous carcinoma of the base of the penis. Tr. 177.

On September 2, 2005, Plaintiff underwent a penile cancer laser excision. The laboratory report from this procedures showed scar formation and no evidence of residual squamous cell carcinoma in situ. Tr. 175.

Records from Dr. Brandes, dated October 5, 2005, reflect that Plaintiff "ha[d] healed well since [his] surgery" on September 2, 2005. The record reflects,

> [Plaintiff] has had a long, complicated history after a penile implant. It sounds like Fournier's gangrene, septic shock, and subsequent penile reconstruction. He then developed carcinoma in situ/verrucous carcinoma . . . . On 09/02/05 he underwent re-resection of the area of the previous resection. We also lasered the surrounding tissue for a 2 cm margin. He has healed well since the surgery.

Tr. 176.

Dr. Brandes further reported on October 5, 2005, that his impression was that Plaintiff had "carcinoma in situ of the penis"; that there were no residual tumor in specimens; and that a metastic work-up was negative. The plan was for Plaintiff to have "close follow-up" and PE and groin exams every three to four months for two years, every six months for two years, and then annually. Tr. 176.

Records from Gene Childress, M.D., of the Quincy Medical Group, dated March 2, 2006, reflect that Plaintiff reported that he has had ongoing treatment for laser topical removal of suprapubic skin carcinoma, which started out as a carcinoma in situ of the penis; that Plaintiff was to have follow-up with the Quincy Medical Group on a periodic basis for any reoccurrence; that Plaintiff was examined; that there was no evidence of verruca eruptions; that there was no evidence of reoccurrence which Dr. Childress could see; and that Plaintiff was to "[c]ontinue routine monitoring." Tr. 301.

Records from Quincy Medical Group, dated September 26, 2006, reflect that Plaintiff presented with abscess to foot area. Tr. 301.

Records from Blessing Hospital, dated September 27, 2006, reflect that Plaintiff presented with pain in his right foot; that "[t]here [was] no evidence of displaced fractures, dislocations, focal osteolytic or osteoblastic lesions"; that the "joint spaces appear[ed] unremarkable with no evidence of hypertrophic or erosive changes"; that "[p]rominent vascular calcifications [were] seen as can be associated with prominent atherosclerosis and/or diabetes"; that "[n]o acute process [was] seen overlying the fourth and fifth digits"; and that "s]ome diffuse demineralization [was] noted." Tr. 185.

Dr. Childress reported on October 2, 2006, that Plaintiff presented post- hospitalization for "an ischemic digit right foot with secondary cellulitis"; that Plaintiff had "a blackened 4th digit with redness extending to the dorsum of the foot to the ankle"; that Dr. Childress diagnosed Plaintiff with "Gangrenous ischemic right 4th digit," "Peripheral vascular disease involving the entire right foot," and "Cellulitis right foot"; that Dr. Childress spoke with Dr. Rumi Faizer of the University of Missouri Vascular Surgery Department; and that Dr. Faizer recommended immediate admission for aggressive therapy for Plaintiff's right foot. Tr. 302.

Records of University Hospital & Clinics of Columbia, Missouri, ("University Hospital") reflect Plaintiff was admitted on October 2, 2006, for gangrene of the right fourth toe; that Plaintiff had a history of insulin dependent diabetes mellitus; and that Dr. Faizer had decided to admit him. Tr. 272-74.

Records of University Hospital further reflect that, on October 6, 2006, Plaintiff underwent angiograms which showed peripheral vascular disease with gangrene. Tr. 281.

Plaintiff was discharged from University Hospital on October 9, 2006. Plaintiff was to return to the hospital for surgery on Friday, October 13, 2006. Upon discharge, Plaintiff "was instructed to gradually resume his normal activities and not to lift more than 10 lb, keep his incision in his groin clean and dry at all times. Keep his foot clean, wash it daily with soap and water and keep dry at all times." Tr. Tr. 269-71.

Records from University Hospital reflect Plaintiff was admitted on October 12, 200, for right fourth toe amputation. Tr. 206-07, 259-68. Plaintiff's toe was amputated on October 13, 2006. Tr. 259. The discharge summary, dated October 14, 2006, states that Plaintiff's " postoperative course was uneventful." Tr. 288-89.

Glenn Gardner, M.D., of University Hospital, reported on November 15, 2006, that Plaintiff was "a 45-year-old diabetic male with a smoking history recently admitted for right leg revascularization for gangrene of the toes"; that Plaintiff had undergone a "right arterial atherectomy and fourth toe amputation and [was] readmitted [on November 15, 2006] with gangrene cellulitis and soft tissue infection of the right foot at the amputation site." Records further state that Plaintiff's heart and rhythm were regular without murmur; that Plaintiff had "normal upper extremity pulses and normal right femoral pulse, absent right popliteal and pedal pulses"; that "[o]n the left, he ha[d] a

normal femoral pulse, but absent popliteal and pedal"; and that Plaintiff was "admitted for IV antibiotic therapy, angiographic evaluation, and right leg revascularization with bypass. Tr. 254-55.

Records, dated November 16, 2006, further reflect Plaintiff had a "US LE Arterial Doppler Multi Lvl Bilat" examination and that the impression from this procedure was as follows: "Right side ABI's are .32 with monophasic waveforms. This is consistent with severe arterial occlusive disease. Right 1st toe pressure of 0 consistent with ischemia. Left side ABI's are 1.22 with triphastic waveforms. This is consistent with mild arterial occlusive disease. Left 1st toe pressure of 84 consistent with normal toe pressures." Tr. 205. Records, dated November 17, 2006, also state that Plaintiff had an ultrasound of the bilateral lower extremities for vein mapping due to "peripheral vascular disease"; that the impression from this test was that "[t]he greater saphenous veins of the bilateral lower extremities were found to be adequate for by-pass conduit at all levels"; that Plaintiff was discharged on that date; that Plaintiff was to follow up in the Cardiac Catheterization Lab for angiography by Dr. Faizer in preparation for a bypass graft to be performed by Dr. Faizer; and that Plaintiff was to report to University Hospital on November 20, 2006, for this procedure. Tr. 203, 257.

Records from University Hospital reflect Plaintiff was admitted on November 19, 2006, and was discharged on December 5, 2006. Plaintiff had a US LE Venous Duplex Bilateral on November 17, 2006, and that the impression from this test was the "greater saphenous veins of the bilateral lower extremities were found to be adequate for by-pass conduit at all levels." Tr. 203. Records further reflect Plaintiff had chest x-rays on November 19, 2006, which showed that Plaintiff had hyperaerated lungs; that there were small metallic densities "overlying heart likely represent prior foramen ovale repair"; that there was no pneumothroax, effusion, or consolidation; that Plaintiff's heart was normal size; that pulmonary vasculature was within normal limits; that there was no "significant gross osseous

abnormality"; and that there was "[n]o acute cardiopulmonary process." Tr. 201. Records further reflect that during Plaintiff's hospitalization he underwent the following procedures:

> 1. On November 22, Dr. Faizer performed right leg angiogram, right popliteal atherectomy, right anterior tibial, dorsalis pedis tibial peroneal trunk and posterior tibial peroneal atherectomy, right anterior tibial and dorsalis pedis angioplasty, intraoperative ultrasound guided access to right common femoral artery. (Records from University Hospital in Columbia, Missouri, dated November 22, 2006, reflect that Plaintiff presented for an examination: "US LE Arterial Doppler Single Lvl." Tr. 199-200. Impressions reveal, "Ankle-brachial indices reflect no significant lower extremity arterial occlusive disease." Tr. 200.) 2. Second procedure November 28, 2006 - Dr. Faizer performed a right leg forefoot amputation.

Tr. 228.

Both the pre- and post-operative diagnoses were "right leg peripheral vascular disease with gangrene." Tr. 249. In Plaintiff's discharge orders/instructions, the "activities of daily living restrictions" section states that:

> bathing: sponge bath; walking: you must use equipment for ambulation; weight bearing: you may NOT bear weight on: right lower extremity; lifting: do not lift more than 15 pounds. must maintain NWB to RLE when lifting; stair climbing: as tolerated and as shown by physical therapy; sexual activity: no restrictions; driving: no driving; work/school: may not work until seen at follow up and wound vac has been discontinued; diet: diabetic diet.

Tr. 201-53, 293-95.

Dr. Faizer wrote a letter to Dr. Childress, dated December 21, 2006, which letter states that, in Dr. Frazier's opinion, for "a good long-term functional outcome ... [Plaintiff] would be better served with a distal below knee amputation." Dr. Frazier further wrote that Plaintiff was "finally accepting the procedure." Tr. 188, 225-27. Records further reflect that Plaintiff was scheduled for below-knee amputation on January 12, 2007. Tr. 222-24.

Dr. Childress reported on January 2, 2007, that Plaintiff presented for ongoing "treatment of a right foot cellulitic response secondary to peripheral vascular insufficiency due to diabetes." Dr. Childress noted on this date that Plaintiff was scheduled to have a below the knee amputation of his right foot on January 12, 2007; that Plaintiff needed to stop smoking; and that Plaintiff's glucose levels were "fluctuant but they have improved from previous." Tr. 299.

Records from University Hospital reflect Plaintiff was admitted on January 12, 2007, and was discharged on January 15, 2007. Hospital records state that Plaintiff had a past medical history significant for diabetes, nonhealing ulcers, and cellulitis in the right lower extremity; that Plaintiff had severe diabetes and had multiple attempts at revascularization to save his foot; and that Plaintiff had a distal foot amputation, with poor healing, and was planned for revision to below-knee amputation for better walking potential. Records also state that the below the knee amputation "was well tolerated"; that, upon discharge, Plaintiff had depressed levels of HCT, calcium, and magnesium; that upon discharge, Plaintiff was instructed, in regard to bathing, to shower only, and to walk with crutches, as tolerated; that Plaintiff had no restrictions as to stair climbing; that he could drive when off pain medication; that he could return to work after being cleared by vascular surgery; that he had no dietary restrictions; and that his condition was "good." Tr. 212-15.

Records, dated January 14, 2007, reflect that Plaintiff presented for a post-operative chest x-ray examination on this date and that the x-ray showed that "[t]he heart size and pulmonary vascularity [were] within normal limits, considering portable technique"; that there was no pneumothorax, pleural effusion, or focal consolidation; and that there were no acute cardiopulmonary findings. Tr. 197.

In a Function Report, dated January 31, 2007, Plaintiff stated that he could ride in a car; that he can walk a short distance with a walker; that his condition affects his ability to lift, squat, walk,

kneel, climb stairs, and complete tasks; that he can follow instructions "O.K."; that he uses crutches, a wheel chair, and a walker; that he uses these aids at "all times"; that he does not shop; that he is able to pay bills; and that his girlfriend takes him for a ride once or twice a week. Tr. 139-46.

Dr. Childress reported on February 2, 2007, that Plaintiff presented for a "[s]tatus post BKA amputation"; that there were "still some areas that [were] not completely healed, so we are not going to remove the entirety of these staples today"; that Plaintiff was "to see Don Kiehl, orthotics and prosthetics on 2/7/07 for consideration of prosthetic fitting"; that Plaintiff was to continuously use stump shrinker; and that "[d]ue to Mr. Jett's (R) below the knee amputation he will require the use of a lightweight wheelchair for the rest of his lifetime." Tr. 298.

Plaintiff's girlfriend, Carla Fletcher, stated in a Function Report-Third Party, dated February 3, 2007, that Plaintiff is often unable to put on shirts or socks; that, to bathe, Plaintiff must use rails and a chair; that Plaintiff has "no problem" caring for his hair, shaving, and feeding himself; that to use the toilet he uses a walker and must always sit; that she has to help Plaintiff with his medications; that Plaintiff does laundry once or twice a week when he is able; and that Plaintiff goes outside once or twice a week and only when he goes out for a drive to a doctor's appointment. Tr. 147-54.

Dr. Childress reported on February 21, 2007, that Plaintiff presented for removal of two staples; that he was being seen on that date for fitting of a prosthesis; that the suture site was well healed and nontender; that Plaintiff was ambulating with crutches; that Plaintiff reported that he was "in good spirits and seem[ed] to be doing well"; that Plaintiff's activity level prior to amputation was "very [active]"; that Plaintiff's present activity level is "as active as possible"; that Plaintiff's hobbies are "hunting, fishing"; and that Plaintiff's goal is "independence." Tr. 306.

Records from Certified Brace and Limb reflect that Plaintiff was seen on February 21, 2007, for a right leg prosthesis. The clinician noted that the suture sight was well healed. Tr. 306. The clinician noted that on March 14, 2007, Plaintiff stood for approximately ten minutes and ambulated twenty feet. Tr. 305. The clinician noted on March 23, 2007, that "all but pea size scab healed" and that he would consult Dr. Childress if it did not heal by the next week. The clinician noted on this date that Plaintiff was wearing his prosthesis on and off all day and ambulating with crutches, and that Plaintiff said he was experiencing no pain. Tr. 305. On April 2, 2007, the clinician noted that Dr. Childress looked at Plaintiff's scab and prescribed a cream; that Plaintiff was anxious to get back to a normal gait; that Plaintiff ambulated approximately ten feet with no assistive devices "but will still require crutches for safety"; that Plaintiff was to limit weight bearing until the scab was gone; and that Plaintiff was to return in one week. Tr. 305.

A Physical Residual Functional Capacity Assessment ("RFC") is signed by Medical Consultant Cara Falter, dated April 5, 2007, states, in regard to exertional limitations, that Plaintiff can occasionally lift and/or carry ten pounds; frequently lift and/or carry less than ten pounds; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and push and/or pull (including operation of hand/foot controls) for an unlimited period of time. Tr. 308. In terms of postural limitations, the Physical RFC Assessment states that Plaintiff can climb ramps/stairs occasionally, never climb a ladder/rope/scaffold, never balance; stoop occasionally, kneel occasionally, crouch occasionally, and crawl occasionally. Tr. 310. In terms of Plaintiff's manipulative, visual, and communication limitations, the Physical RFC Assessment states that Plaintiff has no established limitation. Tr. 310-11. In terms of environmental limitations, including temperature, noise, vibrations, fumes, and hazards, the Physical

RFC Assessment states that Plaintiff was instructed to avoid concentrated exposure to "hazards (machinery, heights, etc.)." Tr. 311.

## IV.
## TESTIMONY BEFORE THE ALJ

**A.    Plaintiff's Testimony Upon Examination by ALJ at the June 17, 2008 hearing:**

Plaintiff testified that at the time of the hearing, he was forty-seven years old; that he lives with his girlfriend and three children; that there are three steps to climb to enter the home; that Plaintiff drove himself to the hearing; and that Plaintiff has a valid driver's licence and drives an average of "30, or 40 miles" each week. Tr. 22-24.

In regard to Plaintiff's education, Plaintiff testified that he has a high school diploma; that he attended one year of college, where he studied paramedics; that he received a certificate and still has his certification; that he received no other vocational training or job training; that he is not licensed or certified in any area other than as a paramedic and a driver; and that he is literate. Tr. 25-26.

Plaintiff testified that he at the time of the hearing he was not working; that he last worked full-time for Bliss County Ambulance District as a paramedic crew chief and that he ceased working because "[his] health just went down so quick and then [he] had leg problems," his medical conditions became drastically worse, and he "was out of work six months of the time and [] was doing five 24s a week and just wasn't working." Tr. 25-26. Plaintiff further testified that, since he ceased working for Bliss County Ambulance District, he has made no attempts to rejoin the workforce and has not submitted any applications for work. Tr. 26.

With regard to everyday activities, Plaintiff testified that, when he gets up in the morning, he "most normally [] crawl[s] to the restroom"; that Plaintiff has "had two or three falls on the walker, so

11

[he doesn't] even bother anymore; that he walked into the hearing room without a walker; that Plaintiff had his right leg below the knee amputated; that Plaintiff's right leg is a prosthesis; that, with the prosthesis, Plaintiff is able to walk; that, after Plaintiff makes coffee, "which takes a while on [his] knees," Plaintiff "usually go[es] back to [his] recliner and start[s] preparing for the day"; that Plaintiff showers, which is "a chore"; that Plaintiff had a walk-in shower installed; that, after Plaintiff showers, Plaintiff gets dressed; that Plaintiff "usually dress[es] the leg before [he] dress[es] [himself]"; that Plaintiff next returns to his recliner and checks his blood sugar; that Plaintiff then takes his Lantus and fixes himself "a little something to eat"; that Plaintiff's girlfriend does some of the cooking and that he does "a little" when she is gone; that Plaintiff is able to do laundry "slowly but surely"; that Plaintiff is able to wash dishes; that Plaintiff has never attempted to make the bed and change the sheets and "suppose[s] [he] could"; that Plaintiff is able to vacuum, sweep, and mop; that Plaintiff does "a little grocery shopping"; that Plaintiff uses a grocery cart for support; and that Plaintiff gets along with his neighbors and believes he "pretty much get[s] along with everybody." Tr. 32-36.

With further regard to how Plaintiff spends his day, Plaintiff testified that he mows the grass and does general maintenance for the mowers; that "general maintenance" of the mowers means Plaintiff ensures they are full of gas and oil; that Plaintiff has about an acre of land to mow; that Plaintiff is usually unable to mow his yard in one sitting; that Plaintiff watches a lot of television; that Plaintiff "do[es] a little bit of reading"; that Plaintiff does not go to the library; that, when he is not mowing the grass, Plaintiff spends the afternoon watching television; that Plaintiff is "somewhat" good with tools; that Plaintiff fixes things around the house; that Plaintiff is able to provide "general maintenance" on his vehicle; and that he does not change the oil on his vehicle. Tr. 36-38. Plaintiff further testified that he is not active in any clubs, organizations, or church. Tr. 36.

With regard to how Plaintiff spends his evening, Plaintiff testified that, when his girlfriend comes home, they have supper; that Plaintiff's girlfriend fixes him supper; that they sit in front of the television most evenings; that "[e]very once in a while [they] go out for a drive . . . ."; that Plaintiff often goes out to eat; that Plaintiff does not often go to the movies; that Plaintiff "entertain[s] [his] boys" on the weekends; that Plaintiff will fish with his boys once in a while, "but usually [he] just kind of watch[es] over them"; that Plaintiff is able to play pool "a little bit"; and that he sometimes takes the weed eater out "but [he] can't run it very long." Tr. 38-40.

Plaintiff testified that he smokes "[p]robably a half a pack [of cigarettes] a day"; that he does not drink alcohol; that he never had an alcohol problem; and that Plaintiff never had a problem with street drugs, including marijuana. Tr. 40.

Plaintiff further testified that he was taking medication, including insulin, Lantus, and Novolog; that he injects himself with insulin "[o]n the average about four times" each day; that he "take[s] the Lantus in the morning," which is the "long-acting" insulin; that he takes the Novolog, which is "fast-acting"; that Plaintiff checks his own blood sugar; that insulin is not controlling Plaintiff's diabetes; that Plaintiff has talked to his doctor about trying different medications to try to level out Plaintiff's blood sugar because "it just fluctuates so much"; and that Plaintiff's blood sugar is improved with medication. Tr. 40-41. Plaintiff testified that he also takes one aspirin per day; that he takes Aleve because he has a sore on his amputated leg, his lower back hurts, and his hands are "real stiff in the morning"; that Plaintiff had bronchitis last winter; that Plaintiff's bronchitis cleared up "but it just keeps coming back it seems like in the wintertime"; that Plaintiff is no longer on Percocet; and that Plaintiff is not on Prilosec for indigestion and takes Tums for indigestion. Tr. 41-42, 57-58.

Plaintiff testified that he has had diabetes for thirty-seven years; that when he becomes hypoglycemic, he has to eat "a candy bar or something" right away; that diabetes is the probable cause of Plaintiff's amputated leg; that, when asked whether Plaintiff was having any other problems due to the diabetes, he responded that he has "a lot of sores on [his] stump"; that, whenever Plaintiff gets sores on his stump, he walks with a cane as "[i]t takes a little bit of the pressure off of it and then [he] leave[s] the leg off for a day or two and they usually heal up okay"; that Plaintiff uses a cane when he has sores on his leg and he keeps the leg on; and that, if Plaintiff keeps the leg "completely off like the doctor told [him] to do," then he is "just usually crawling around the house for a day or two . . . ." Tr. 43-44.

Plaintiff testified that he has some retina damage in the left eye from the diabetes; that laser surgery "wouldn't fix" Plaintiff's retina damage "[s]o, they had to go in and take some of the . . . vessels off the back of the eye off the retina"; that it has "been a while" since Plaintiff had that retinal operation; that Plaintiff has some scar tissue on his left eye; that he has peripheral vision out of the left eye "but [he] can't see [anything] straight ahead"; that Plaintiff's right eye is dominant; that he has problems with depth perception, "mainly . . . when [he's] ... shooting pool"; that Plaintiff depth perception problems do not create any problems for Plaintiff when he drives; that Plaintiff has "adjusted" to his eye problems. Tr. 45-46.

Plaintiff testified that he had a stroke; that Plaintiff's lasting problems from the stroke is that he has no strength in two right-hand fingers and has "a little trouble writing"; that "[e]verything else pretty much [came] back after his stroke; that Plaintiff is able to use his hands to button his clothes and zip his zippers; that Plaintiff can feed himself with a knife, fork, and spoon; that Plaintiff "can't get down

to get on [his] sock"; that Plaintiff has no problems combing his hair; and that Plaintiff can use his hands to open a doorknob. Tr. 44-45.

Plaintiff testified that he had cancer at one time; that Plaintiff no longer has cancer; that Plaintiff has a problem with infections; that seems "every time [he] get[s] a sore on [his] foot [he] lose[s] something or another"; that Plaintiff's middle toe on his left foot was amputated due to an infection; that Plaintiff is able to walk "okay" on the left foot; that Plaintiff watches the left foot very carefully; and that Plaintiff has to be careful when he is on his feet for long durations. Tr. 46-47.

Plaintiff testified that he does not have any problems sitting in a chair for a short period of time; that his lower back hurts when he sits for too long; that Plaintiff goes to a chiropractor in Quincy on a regular basis for his back; that Plaintiff visits this chiropractor every three or four weeks; that when Plaintiff's back is hurting him, the pain is usually "a seven or an eight"; that it helps alleviate Plaintiff's pain to "get down on all fours and the girlfriend kind of puts pressure on [his] back and usually that relieves [him] somewhat"; that Plaintiff has not noticed if taking Aleve reduces his back pain; and that, if Plaintiff has a problem with his back now, "it's only about a two or a three" [on the pain scale]. Tr. 48-49.

Plaintiff further testified that he has problems standing up for long periods of time; that Plaintiff can walk "a couple blocks, maybe three without rest"; that Plaintiff thinks he is able to "carry 30 pounds for a short distance"; that Plaintiff can "only get around on all fours with his leg off"; that when he gets down on all fours with his prosthesis on, it falls off"; and that he takes stairs "[o]ne step at a time." Tr. 49-50.

Plaintiff testified that his thumb and his index finger on his dominant hand "don't work as well as they used to"; that Plaintiff no longer has the strength nor the agility with his right hand as he does

with his left hand; that he does have "a little bit of tenderness" from his leg amputation; that it is difficult for Plaintiff to walk on uneven surfaces because, with his stump leg, "the foot doesn't bend"; that Plaintiff's amputation affects his ability to climb stairs; that he is able to climb stairs "one step at a time"; and that Plaintiff has to step onto the step and then bring his amputated foot up. Tr. 54-57.

Plaintiff testified that he can walk approximately two blocks on "flat, level ground"; that Plaintiff can stand "five or ten minutes" at a job or at a table; that, at the hearing, he was able to sit for at least an hour and has "to move [his] leg around a little bit" underneath the table; that he runs a vacuum cleaner for five minutes; that he is able to load and unload the dishwasher; and that Plaintiff's leg limits his movement and his ability to do basic functions; that he can bend over; that he cannot squat; that, if he were to bend over to pick something up, he imagines he would be able to pick up twenty or thirty pounds; and that Plaintiff cannot kneel or crouch on both knees because he has a bad knee on his right side. Tr. 58-61.

Plaintiff testified that he sees a chiropractor on a regular basis; that his regular physician is Dr. Childress; that Plaintiff is unable to see Dr. Childress on a regular basis because he has no medical insurance; and that Dr. Childress wants to try other diabetes medicine with Plaintiff, which Plaintiff is currently unable to afford. Tr. 62

Plaintiff testified that he thought he could use the weed eater for "[a]bout five minutes at max" without either being in great pain or stopping to rest; that Plaintiff is unable to change the oil on his car; that Plaintiff is able to fill the car with fuel and check the oil; that Plaintiff does not think he could change a tire; that there used to be "a lot" of engine work that Plaintiff was able to do on his vehicles; and that Plaintiff is not able to do this work anymore. Tr. 63-64.

**B.      Testimony of Jeffrey Courson:**

Jeffrey Courson testified that he has been Plaintiff's friend for thirty-two years; that Plaintiff is six years older than Courson; that he and Plaintiff played "a lot of [soft]ball" together; that Plaintiff would be unable to play softball in his condition today; that Plaintiff was "having a hard time getting around"; that during the winter Mr. Courson had to help Plaintiff get into the truck everyday... because [he] didn't want him to fall"; and that Plaintiff "stopped to rest a couple times just coming up here" to testify Tr. 65-68.

Mr. Courson further testified that Plaintiff's "mental capacity sometimes just isn't there"; that Plaintiff is "getting to the point where he might forget to take a shot ; that Plaintiff was "supposed to take some medical classes to keep his license up to date but [Courson] just [doesn't] think [Plaintiff] could"; and that, "if [Plaintiff is] in one of his . . . forgetfulness moods . . . [Courson] wouldn't want to seek medical advice from him." Tr. 68-70.

## C.     The Vocational Expert's Testimony:

Vocational Expert ("VE") Dr. Magrowski testified that he is familiar with the jobs that exist in the State of Missouri; that he has reviewed the exhibits in the file dealing with Plaintiff's past work; and that he heard the testimony at the hearing. Tr. 71.

The VE testified that he was aware Plaintiff worked as a crew chief paramedic (EMT) for an ambulance district; that "[t]he DOT really doesn't have a title for that position"; that the DOT has a title for the position of a paramedic: "[t]ypically it's a skilled job, has at least an SVP of 5 and is considered medium in exertion. As [Plaintiff] performed it at times he reflected he had to lift people like over 100 pounds, so it could go to very heavy in exertion." Tr. 71-72.

The ALJ posed the following hypothetical question to the VE:

> Please assume a person the age of 47 with a high school education and the past relevant work experience as you have identified. Please assume I would find this person capable of performing the exertional demands of sedentary work as defined in the Social Security regulations, specifically the person can lift, carry or push/pull 20 pounds occasionally, 10 pounds frequently. The person could sit for six out of eight but could stand/walk no more than two out of eight of eight out of eight. The person can occasionally climb, balance, stoop, kneel, and crawl, no crouch. The person should have no exposure to ladders, ropes, or scaffolds, no concentrated exposure to moving machinery or unprotected heights."

Tr. 72-73. With regard to that hypothetical, the VE testified that there would be transferable work skills, specifically, "[Plaintiff] has skills involving communications, dealing with emergency situations, operation radio equipment. He also has skills of an abstract nature to read and understand directions on medical treatment, some skill in reports, writing reports, detailed reports regarding accidents." Tr. 73. The VE testified that Plaintiff's "past work was more of a medium nature in the national economy. So, I think with those restrictions he couldn't return to that." Tr. 73.

Upon the VE's testimony that Plaintiff could not return to his previous employment, the ALJ noted that the burden to demonstrate that there are jobs available to Plaintiff falls to the agency. The ALJ then inquired whether there would be other jobs that an individual with the restrictions as posted could perform. The VE responded, "Yes, I think some work as a dispatcher which would be semiskilled, 913.367.010." For the dispatcher position, the VE testified,

> There [are] about 2,000 [positions] in the State, over 175,000 in the national economy; some work as a surveillance system monitor, 237.367-014, there's about 300 in the State, over 10,000 in the national economy; and some work as a weight tester in recycling, 539.485-010, again there's about 300 in the State and over 35,000 in the national economy. The last two would be unskilled, sedentary jobs.

Tr. 73-74.

As the ALJ posed a second hypothetical "limiting the [Plaintiff] to simple, repetitive tasks," he inquired whether Plaintiff could still perform the positions of a surveillance system monitor and the weight tester recycling since they are unskilled. The VE answered in the affirmative. Tr. 74.

Finally, the VE testified that, to his knowledge, none of the evidence he provided conflicts with the Dictionary of Occupational Titles or the SCO. Tr. 74.

Plaintiff's attorney asked the VE whether all of the jobs he testified about would require concentration for periods of time. The VE answered in the affirmative. Further, the VE testified that, in a dispatcher position,

> There is some alternate sit/standing allowed. A lot of times it depends on the shift. There's times when they're very busy and there's times when they're not, not so busy. There are different types of dispatching, not necessarily medical services but there are also cab dispatching, delivery dispatching, things of that nature.

Tr. 74-75.

## V.
## DECISION OF THE ALJ

The ALJ held that the preponderance of the medical and other evidence was inconsistent with Plaintiff's allegation of disability, and that the medical evidence did not establish any impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4. Tr. 13. The ALJ noted that although Plaintiff "still has some definite physical impairments and restrictions . . . he is not totally unemployable." Tr. 15.

The ALJ considered that although Plaintiff alleged an onset date of disability of September 1, 2005, he admitted that he resumed work after that date and that he did not retire as a paramedic until August 2006, and that Plaintiff had not performed any substantial gainful activity since August 2006. Tr. 12.

The ALJ considered that Plaintiff testified that he has had diabetes for thirty-seven years; that he takes insulin shots four times each day; that Plaintiff's diabetes led to a below-the-knee amputation of Plaintiff's right leg and placement of a prosthesis, the loss of the middle toe on his left foot, and retinal damage in his left eye necessitating laser surgery and leaving residual scar tissue; that, although Plaintiff checks his blood sugar several times daily, Plaintiff's blood sugar is usually above normal range; that although the Plaintiff's "insulin-dependant diabetes mellitus [] is not ideally well controlled, [] it has yet to result in any documented secondary damage to the eyes, heart, brain or kidneys"; and that there is no documented evidence of any serious vision loss, back pain, hand pain or instability, shortness of breath, abdominal pain, or left foot pain. Tr. 15.

Further, the ALJ considered that Plaintiff was hospitalized for a flesh-eating staph infection" with septic shock and subsequently underwent a penile implant; that, before September 2005, Plaintiff had a bout of malignant melanoma on his penis requiring partial amputation of the penis; and that "[b]y March 2, 2006, the recurrent carcinoma had resolved" and "[t]here was never any metastasis." Tr. 12-14.

The ALJ also considered that, after Plaintiff resumed work following his hospitalization for septic shock, Plaintiff had a stroke; that Plaintiff testified that, excluding some loss of strength in two fingers on his right hand, "[e]verything else pretty much [came] back after his stroke"; that Plaintiff had an episode of chest pressure on December 19, 2004; that "there was no evidence of significant heart or lung disease"; that the medical records failed to substantiate Plaintiff's allegations regarding decreased functioning of his right hand; and that, therefore, Plaintiff's alleged symptoms and limitations are insufficient to prevent the performance of work activity. Tr. 12-15.

The ALJ also considered that Plaintiff testified that he had recurring sores on the stump of his right leg and that he often had to use a cane to walk and that "[n]o [treating or examining] doctor has placed any specific long-term limitations on the [Plaintiff's] abilities to stand, sit, walk, bend, lift, carry, or do other basic exertional activities beyond those the vocational expert was asked to assume in determining the [Plaintiff's] employability." Tr. 15.

The ALJ considered Plaintiff's other allegations which included recurrent bronchitis, especially during the winter months, back pain for which he saw a chiropractor, and indigestion for which he took Tums. The ALJ noted that Dr. Childress, Plaintiff's main treating physician, treated him for bronchitis on October 18, 2004, which is not a long-term problem. Tr. 13, 15.

With regard to Plaintiff's mental health, the ALJ noted, that there "is no documented evidence of nonexertional pain seriously interfering with or diminishing [Plaintiff's] ability to concentrate. No doctor or other qualified person has stated or implied that [Plaintiff's] alleged physical symptoms are the product of any mental impairment." Tr. 15. In addition, the ALJ stated that the testimony by Mr. Courson and the statement by Ms. Fletcher, Plaintiff's girlfriend of five years, are not proof of disability. In this regard, the ALJ held:

> Their statements, like the [Plaintiff's] testimony, were inconsistent with the preponderance of the opinions and observations by qualified medical personnel in this case. What a claimant alleges or displays to a lay third party, even to a spouse or close friend or relation, may not be indicative of a true maximum level of physical or mental functioning.

Tr. 16.

After consideration of the record in its entirety, the ALJ found,

> The medical evidence establishes that the [Plaintiff] has insulin-dependent diabetes mellitus and status-post right leg amputation with prosthesis secondary to peripheral vascular disease, and status-post penile implant related to verruca carcinoma, but no

impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

Tr. 16.

The ALJ concluded that:

The [Plaintiff] has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for prolonged or frequent standing or walking, lifting or carrying objects weighing more than 10 pounds; climbing of ropes, ladders or scaffolds; doing more than occasional climbing of ramps and stairs or balancing, stooping, kneeling crouching, or crawling; or having concentrated or excessive exposure to unprotected heights or dangerous moving machinery.

Tr. 16-17.

The ALJ then found that "[b]ased on an exertional functional capacity for sedentary work, and the claimant's age, education, and work experience, 20 CFR 404.1569 and Rule 201.22 (201.28 prior to March 14, 2006), Table No. 1, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of 'not disabled.'" Tr. 17.

# VI.
# LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)).

In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe

impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)). Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. §§ 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug.26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove

disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); <u>Charles v. Barnhart</u>, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. <u>Clark v. Heckler</u>, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002). <u>See</u> <u>also</u> <u>Cox v. Astrue</u>, 495 F.3d 614, 617 (8th Cir. 2007). In <u>Bland v. Bowen</u>, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

<u>Id.</u> at 535. <u>See</u> <u>also</u> <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017 (8th Cir. 1996)); <u>Hartfield v. Barnhart</u>, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. <u>Cox</u>, 495 F.3d at 617; <u>Guillams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005); <u>McClees v. Shalala</u>, 2 F.3d 301, 302 (8th Cir. 1994); <u>Murphy v. Sullivan</u>, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. <u>Davis v.</u>

Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.

2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen,

830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992)

(holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial

evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject

to reversal merely because substantial evidence may also support an opposite conclusion or because

the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations

omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir.

2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d

707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence,

the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ.& Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v.

Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223

(8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. <u>Robinson</u>, 956 F.2d at 841; <u>Butler v. Sec'y of Health & Human Servs.</u>, 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each <u>Polaski</u> factor." <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. <u>Id.</u> Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. <u>Rautio v. Bowen</u>, 862 F.2d 176, 179 (8th Cir. 1988); <u>Millbrook v. Heckler</u>, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. <u>Karlix v. Barnhart</u>, 457 F.3d 742,746 (8th Cir. 2006); <u>Nevland</u>, 204 F.3d at 857 (citing <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. <u>Goff,</u> 421 F.3d at 790; <u>Nevland</u>, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. <u>Warner v. Heckler</u>, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. <u>Goff,</u> 421 F.3d at 790; <u>Nevland</u>, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's

limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## VII.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Substantial evidence is that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. See Jones v. Chater, 86 f.3d 823, 826 (8th Cir. 1996). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Thus, even if there is substantial evidence which would support a decision opposite to that of the Commissioner's decision, the court must affirm his decision so long as there is substantial evidence in favor of his position. Jones, 86 F.3d at 826.

Plaintiff argues "that the decision of the Commissioner of Social Security is not supported by substantial evidence because, among other things, the ALJ did not fully develop the record and because the ALJ erred in finding that Plaintiff has the RFC to perform sedentary work. Upon reviewing the administrative record as a whole, the undersigned finds that the decision of the ALJ in this matter is not supported by substantial evidence for the reasons suggested by Plaintiff.

The ALJ found that Plaintiff cannot perform his past relevant work as a paramedic. The ALJ further found, however, that Plaintiff can perform sedentary work not requiring the climbing of ropes, ladders or scaffolds; not requiring more than occasional climbing of ramps and stairs or balancing, stooping, kneeling, crouching, or crawling; and not requiring concentrated or excessive exposure to unprotected heights or dangerous moving machinery. The ALJ noted that sedentary work requires lifting or carrying no more than 10 pounds at a time and occasionally lifting or carrying articles such as docket filles, ledgers, and small tools and that jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

20 C.F.R. § 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Indeed, SSR 85-15, 1985 WL 56857, at *5, states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. ... If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." The sitting requirement for the full range of sedentary work "allows for normal breaks, including lunch, at two hour intervals." Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (citing SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996)). Additionally the range of sedentary jobs requires a claimant "to be able to walk or stand for approximately two hours out of an eight-hour day. The need to alternate between sitting and standing more frequently than every two hours could significantly erode the occupational base for a

full range of unskilled sedentary work." Id. at 997 (citing 1996 WL 374185 at *7). Moreover, SSR 96-9p requires that "the RFC assessment should include the frequency with which an applicant needs to alternate between sitting and standing, and if the need exists, that vocational expert testimony may be more appropriate than the grids." Id. It also states that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of disabled."

In Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004), the court held as follows:

Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of a case. See, e.g., Schaal v. Gammon, 233 F.3d 1103, 1106 (8th Cir.2000) (quoting Maryland v. Craig, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)). ... However, social security hearings are non-adversarial. See Reeder v. Apfel, 214 F.3d 984, 987 (8th Cir.2000). ... Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. See Nevland, 204 F.3d at 858; Landess v. Weinberger, 490 F.2d 1187, 1188 (8th Cir.1974). The ALJ's duty to develop the record extends even to cases ... where an attorney represented the claimant at the administrative hearing. See Warner v. Heckler, 722 F.2d 428, 431 (8th Cir.1983). The ALJ possesses no interest in denying benefits and must act neutrally in developing the record. See Richardson v. Perales, 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) ("The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts."); Battles v. Shalala, 36 F.3d 43, 44 (8th Cir.1994) (noting that the Commissioner and claimants' counsel both share the goal of assuring that disabled claimants receive benefits).

The duty to develop the record only arises where "a crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). "'[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 488 (8th Cir.1995)).

Further, an "ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant

is disabled." Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994) (citing Conley v. Bowen, 781 F.2d 143, 146 (8th Cir.1986)).

Plaintiff is an insulin dependent diabetic with peripheral vascular insufficiency due to diabetes and who has had right leg amputation and retina damage to his left eye. The most recent medical records from a treating physician are from February 21, 2007, nineteen days after Plaintiff underwent amputation of his right leg below the knee. At that point he had not even been fitted for a prosthesis and was ambulating with crutches. While the record includes notations from the clinician who fitted Plaintiff for his prosthesis, the clinician is not an accepted medical source. See § 20 C.F.R. § 419.913(a) (listing acceptable medical sources). Moreover, the clinician's last notations are those of April 2, 2007, these notations are no more than six weeks after Plaintiff's below the knee amputation. Even on this date Plaintiff could ambulate only ten feet with no assistive device and he was told to limit weight bearing.

Plaintiff testified, at the hearing, held over a year after his below the knee amputation, that since he had his right leg amputated he has had a toe on his left foot amputated and that two of his fingers go numb. The only evidence in the record regarding Plaintiff's ability to sit, stand, crouch, and crawl is Plaintiff's testimony. No medical source has offered an opinion in this regard. While Plaintiff testified that he can crawl, he testified that he can do so only with his prosthesis removed. Nonetheless, the ALJ found that Plaintiff can crawl occasionally. Plaintiff testified that he frequently has sores on his right leg stump and that, when he has sores, he either continues to use his prosthesis and a cane or he does not use the prosthesis for several days. Obviously, Plaintiff did not have these sores prior to his right leg amputation and they were not considered a recurring problem until after February 2007. As such, there is no medical evidence regarding Plaintiff's limitations, if any, because of the sores on

31

his stump. Indeed, Plaintiff testified that he can walk approximately two blocks on "flat, level ground"; that he can stand "five or ten minutes" at a job or at a table; that, at the hearing, he was able to sit for at least an hour and has "to move [his] leg around a little bit" underneath the table. There is no medical evidence, however, regarding Plaintiff's ability to sit, stand, and walk. Nonetheless, the upon finding that Plaintiff can perform sedentary work, the ALJ necessarily found that Plaintiff can sit or stand for two hours at a time and that Plaintiff can walk or stand for approximately two hours out of an eight-hour day. Moreover, the ALJ did not consider that Plaintiff said that when he walks, he can do so only on flat surfaces. While Plaintiff said that he cannot squat, the ALJ found that he can do so occasionally. Additionally, although Plaintiff testified that he takes insulin four times a day, the ALJ did not consider the extent to which Plaintiff would have to be accommodated in this regard and/or whether this placed any limitations on his ability to engage in substantial gainful activity.

The only Assessment made of Plaintiff's capabilities was conducted by a non-examining consultant, with no apparent medical qualifications. This Physical RFC Assessment was completed two months after Plaintiff's leg amputation. There are no medical opinions or reports in the record to support the medical consultant's conclusions in the RFC Assessment, including the statement that Plaintiff can walk for a total of two hours and sit with normal breaks for six hours a day.

In the matter under consideration, the court finds that the record presented to the ALJ did not give sufficient medical evidence to enable to ALJ to determine whether Plaintiff is disabled. See Barrett, 38 F.3d at 1023. Indeed, facts critical to determining whether Plaintiff is disabled are not included in the record. See Ellis, 392 F.3d at 994. The ALJ, therefore, should have more fully

developed the record. See Snead, 360 F.3d at 838.[2]   As such, the court also finds that the ALJ's finding regarding Plaintiff's RFC is not supported by substantial evidence. Considering the incompleteness of the record discussed above, the court further finds that the record is insufficiently developed and that the decision of the ALJ is not supported by substantial evidence. See Krogmeier, 294 F.3d at 1022; Cox, 495 F.3d at 617.   The court will, therefore, reverse this matter and remand it to the ALJ so that the record can be fully developed in accordance with this decision.

Upon remand the ALJ shall fully develop the record by requesting that Plaintiff provide his medical records subsequent to February 2007, and by ordering that Plaintiff undergo examination by a consulting physician who is qualified to assess Plaintiff's diabetes and his physical limitations. The physician should not only examine Plaintiff and but also opine regarding Plaintiff's capabilities and limitations. The medical consultant's report specifically should address the extent to which Plaintiff's diabetes is controlled, the extent of damage to his eyesight, if any, the status of Plaintiff's peripheral vascular insufficiency, and Plaintiff's abilities in regard to sitting, walking, standing, squatting, crouching, and lifting. Upon remand, Plaintiff should have the opportunity to present additional evidence.

## VII.
## CONCLUSION

The court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4. Upon remand, the ALJ is directed to fully develop the record in a manner consistent with this court's opinion. The court

---

[2]        The court notes that Plaintiff is represented by counsel. As such, the court finds it perplexing why counsel did not assure that the record was fully developed. Nonetheless, it remains the ALJ's duty to assure that the record is fully developed.

stresses that upon reversing and remanding this matter it does not mean to imply that the Commission should return a finding of "disabled." The court is merely concerned that the Commissioner's final determination, as it presently stands, is not supported by substantial evidence on the record as a whole.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief which Plaintiff seeks in his Complaint and Brief in Support of Complaint is **GRANTED** in part, and **DENIED**, in part. Docs. 1, 13.

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will issue contemporaneously herewith remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.

**IT IS FURTHER ORDERED** that upon entry of the Judgment, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.


/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of October, 2009.